**UNITED STATES of America,
Plaintiff,**

v.

**Charles PAUL, Director of Agriculture, State of California, and Thomas C. Lynch, Attorney General, State of California, Defendants.**

**No. 43612.**

United States District Court
N. D. California, S. D.
July 14, 1965.

Cecil Poole, U. S. Atty., Howard E. Shapiro, Atty., Dept. of Justice, for plaintiff.

Thomas C. Lynch, Atty. Gen., State of California, San Francisco, Cal., for defendants.

Steck & Marston, Pasadena, Cal., for Dairy Institute.

McVay, Reid & Azevedo, Modesto, Cal., for Milk Producers.

Schofield, Hanson, Bridgett, Marcus & Jenkins, San Francisco, Cal., amici curiae.

Joseph A. Rattigan, Santa Rosa, Cal., and Cushing, Cullinan, Hancock & Rothert, San Francisco, Cal., for Petaluma Cooperative Creamery.

Before JERTBERG, Circuit Judge, and HARRIS and SWEIGERT, District Judges.

SWEIGERT, District Judge.

This case is before the Court upon an application by the United States for a preliminary injunction restraining the Director of Agriculture and the Attorney General of California from enforcing the provisions of the California Agricultural Code, and regulations thereunder, insofar as they prohibit the sale of milk to United States military installations in California at less than "cost" as defined by the applicable statutes and regulations.

In Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963), affirming this Court's ruling in United States v. Warne, D.C., 190 F.Supp. 645 (1960) the Supreme Court reviewed the applicable federal procurement statutes, 10 U.S.C. §§ 2301–2314, including certain changes made in 1962, Sec. 2306(f) and Sec. 2304(g), and the applicable federal procurement regulations thereunder. 32 CFR Sec. 1.300–1 et seq.

The Supreme Court held that these federal procurement statutes and regulations required competitive bidding, or negotiations that reflect active competition, and that the then existing California milk price stabilization statutes and regulations requiring sellers of milk to charge minimum wholesale and retail prices in sales to the United States for use on military installations, were in conflict with federal procurement policies and defeated the purpose thereof by hav-

ing a state officer fix the price on the basis of factors not specified in federal law.

No claim is made by the State of California that federal procurement is now any different than it was when considered in Paul.

The pending case arises out of an attempt on the part of the State of California to revise the milk price stabilization provisions of its Agricultural Code to conform with what the state claims to be a proper construction of Paul v. United States.

After the decision in Paul v. United States, supra, the State of California revised its Milk Stabilization and Marketing statutes (Cal.Stats.1963, Chap. 1741, especially Cal.Agricultural Code, Secs. 4105.1, 4135, 4216, 4217.1, 4243) and in 1965 its Director of Agriculture adopted certain regulations to implement the new program. (Title 3, California Administrative Code, Secs. 1960–1963.)

This revision was designed to put into effect a program prohibiting sales of milk at less than a distributor's minimum "cost" as defined by statute, in lieu of the state's former program requiring distributors to sell at a minimum "price" established by its Director of Agriculture.

Section 4135 of the Agricultural Code was amended and now provides that the sale by any retail store, manufacturer or distributor, including any producer-distributor or non-profit cooperative association acting as a distributor, "at less than cost," is an unfair trade practice. "Cost" is defined as the cost of the raw product, plus all costs of manufacturing, processing, sale and delivery, including overhead costs, and in the case of retail stores invoice or replacement cost, whichever lower, plus the cost of doing business. Cost of raw product is defined as the applicable minimum price payable by distributors to producers, pursuant to stabilization or market plans in effect, provided that as applied to sales on a bid basis to public agencies, cost of raw product is applicable only to "Class 1" market milk or market cream. It is further provided that evidence of cost, based

on audits or surveys, made in accordance with generally accepted cost accounting procedures, shall constitute prima facie evidence of such cost.

Section 4141 of the California Agricultural Code provides that: "Nothing in this article shall be construed to prohibit the meeting, in good faith, of a lawful, competitive price or a lawful, competitive condition * * *."

On March 1, 1965, the California Director of Agriculture promulgated regulations to implement these statutes. Title 3, California Administrative Code, Section 1960, provides that the regulation applies to "any type of customer, including agencies of the United States government except as to those provisions which are stated to be applicable only to such agencies," and contains the following statement of policy:

"It being the policy of the United States Government to respect the right of this state to enforce price provisions of the Agriculture Code with respect to producer prices for milk purchased for processing and sale to agencies of the United States Government, as stated in Paul v. the United States, 371 U.S. 245 [83 S.Ct. 426], this Article, as applied to such sales, constitutes the means with which the State of California enforces minimum producer prices in sales of milk and dairy products to agencies of the United States Government. This Article does not establish any minimum uniform price applicable to sales of milk and dairy products to agencies of the United States Government, but instead prohibits each distributor from selling milk and dairy products to the agencies of the United States at less than the cost to the particular distributor, except in the instance where such distributor lawfully meets a lawful competitive price or lawful competitive condition."

The State of California asserts that the purpose of these statutes and regulations is to enable it to enforce a right expressly reserved to it in Paul v. United States, supra, and later acknowledged by the United States, i.e., a right to enforce

state established minimum *producer* milk prices.

The State relies upon a representation made by the United States in its jurisdictional statement to the Supreme Court in Paul v. United States, supra, as follows: "There is no longer any necessity for the Court to consider whether appellants can constitutionally enforce the established California minimum *producer* prices with respect to milk farmers selling to distributors for processing and ultimate resale to the United States. The Federal Government, while not conceding that California can regulate producer prices, over the objection of the Federal Government, where the milk is to be resold to the United States, has concluded as a matter of procurement policy not to assert immunity from these minimum prices but to accede to full compliance with these requirements. Accordingly, the United States now suggests that, without further briefing or argument, the Court remand the cause to the District Court for a deletion of that part of the final order enjoining enforcement of the minimum producer price regulations as to milk sold to distributors for resale to the Federal Government."

The United States made clear, however, in its Memorandum in Response to Jurisdictional Statement, that it "continues to oppose any attempt by California to regulate the price at which distributors may sell milk or milk products to the military installations involved."

This position of the United States was noted by the Supreme Court as follows: "The United States has abandoned a further claim that California cannot constitutionally enforce her price regulations against *producers* with the respect to milk sold to distributors for processing and ultimately resold to the United States. The abandonment of this claim is not a confession of error but only a decision not to assert immunity from *that* price control as a matter of procurement policy. * * * In view of these facts, the case now involves only California's power to enforce her minimum wholesale prices for 'fluid milk' with re-

spect to sales to the United States at the three bases involved." Paul v. United States, footnote 1, 371 U.S. at 247, 83 S.Ct. at 429 (emphasis added).

The State further relies upon a letter dated July 29, 1964 from the Assistant Secretary of Defense to the California Director of Agriculture, rejecting a proposed Memorandum of Understanding, but stating: " * * * the Department of Defense has stated that it does not oppose imposition of state-established producer minimum prices where the transaction involved is not directly between the Government and producer. There has been no change in this position."

The state contends that its revised Section 4135, and the regulations thereunder, do not have the effect of prohibiting sales to the United States at less than a state minimum wholesale or retail price but are merely a means of enforcing, as consented to by the United States and as reserved in Paul, minimum prices required by the state to be paid to *producers*.

The United States, on the other hand, contends that the new program of the state is not merely an enforcement of payment by distributors of the established minimum *producer* price, but is in effect an enforcement of minimum wholesale and retail prices in sales by *distributors* to the United States under the guise of regulating the "minimum cost," determined by state audit, at which a distributor may sell; that the revised program conflicts with federal procurement statutes, regulations, and policy for basically the same reasons as did the state's former program reviewed and struck down in Paul, and that this case is, therefore, controlled by the rationale of Paul. We agree with the government.

The state argues that the position now taken by the United States is inconsistent with its representation of consent to enforcement of full compliance with producer price regulations, pointing out that any attempt by the state to assure that milk producers will be returned the minimum producer price for milk ultimately resold to the United States must obvious-

456

ly and of necessity set a price floor on milk prices bid by distributors on sales to military installations.

Assuming such to be the practical result of minimum producer price enforcement by the state, it would set a floor only to the extent that the minimum producer price, if actually paid by a distributor, would be part of a distributor's cost. Apparently, the United States considered such a practical result when it made its representation concerning enforcement of minimum producer prices. It would not necessarily follow, however, that any such floor would include the minimum producer price of the raw product, if not actually paid by the distributor, nor would such a floor include other distributor costs in the absence of state requirement of inclusion thereof in a distributor's ultimate price to the United States.

If the state's program were limited to enforcement of the minimum price required to be paid to producers in producer-distributor transactions, the state's citation of Polar Ice Cream & Creamery Co. v. Andrews, 375 U.S. 361, 382, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964) would be pertinent to the proposition that such enforcement, like the state milk processor tax upheld in Polar, would not conflict with federal procurement even though the economic effect thereof might fall upon the United States as an ultimate purchaser.

■ However, the state program here is not limited to enforcement of minimum producer prices by the state in distributor-producer transactions. Section 4135 does not require that the distributor shall have paid the producer the established minimum producer price. It simply provides that the established minimum producer price shall be deemed to be the distributor's cost of raw product for purposes of computing all the costs of a distributor required to be included in any sale by distributor. Thus, the thrust of the statute is not upon the transaction between distributor and producer, but directly upon sales by a distributor, among which sales are expressly includ-ed sales to "agencies of the United States."

The state explains this feature of this new program by pointing out that, if the state limited itself to enforcement of minimum producer prices in transactions between a producer and a conventional distributor, its enforcement efforts would in practice be ineffective with respect to producer-distributors, including processing cooperative associations, and that "the only known way" of assuring that all producers are being returned the minimum producer price is to calculate all the distributor's costs in selling milk to the federal government, add these to the minimum producer price, and then enforce the resultant "cost" of selling the milk.

■ These practical internal problems involved in attempts to enforce payment of minimum producer prices do not constitute legal justification for regulating minimum "costs" which, in effect, constitute the minimum "price" at which a distributor may sell to the United States. We further observe that the problem of enforcement, insofar as members of processing cooperative associations are concerned, arises out of the enactment by the State of California, contemporaneously with the 1963 revisions of the Agricultural Code already noted, of provisions relating to cooperatives which in effect exempt cooperatives from accounting to their members for minimum producer prices. (Cal.Stats.1963, Chap. 1741, Secs. 4 and 12; Cal.Agric.Code, Secs. 4105.1 and 4217.1.)

■ The State of California makes the further point that its statutory and regulative scheme allows a distributor to sell to the United States at a price even less than sufficient to cover his costs in the instance where such distributor is meeting "in good faith * * * a lawful competitive price or lawful competitive condition * * *." (Agricultural Code, Sec. 4141; Administrative Code, Sec. 1960.)

However, in order to "meet" a competitive price or a competitive condition,

suppliers must know the competitive price or condition. But suppliers submitting bids to the United States may not disclose their bids directly or indirectly to any other bidder, offeror, or competitor and the party submitting a bid must also submit a certification to this effect. 32 CFR Sec. 1.115. This exceptive provision of the state program is not sufficient to avoid conflict with federal procurement.

Further, this exceptive provision, if practical at all, would be applicable only to negotiated purchases of milk by the United States—as distinguished from purchases upon advertising for competitive bids.

Although the United States may make negotiated purchases of a perishable such as milk (10 U.S.C. § 2304(a) (9)), the regulations provide, as pointed out in Paul, that procurement, whether advertised or negotiated, must be on a competitive basis to the maximum practicable extent. (32 CFR Sec. 1.300-1.)

In 1962 Congress wrote into the procurement law a provision requiring formal competitive advertising in all cases in which it is "feasible and practicable" (P.L. 87–653, 76 Stat. 528; 10 U.S.C. § 2304(a)), in order to express in the law a preference for formal advertising— even with respect to the 17 exceptions in which negotiation is permitted. For these reasons it is procurement policy in California to purchase milk only by competitive bidding.

It is true that the new state program contemplates competition between suppliers to the extent that their individual costs, over and above the fixed "raw product" item, may vary. However, the competition required by procurement policy is not limited to competition among bidders who offer to sell at or above their own costs—any more than the procurement considered in Paul was restricted to competition at or above the established minimum price.

On the contrary, procurement regulations provide (at least with respect to negotiated purchases) that, where products are sold in the open market, costs are not necessarily the controlling factor in establishing a particular seller's price. Government procurement is concerned primarily with the reasonableness of the price which the Government ultimately pays and only secondarily with the eventual cost and profit to the contractor. (32 CFR Sec. 3.806(a), (b).)

The further provision of procurement regulation, 32 CFR Sec. 3.801–1 to the effect that supplies are to be procured from responsible sources "at fair and reasonable prices" does not restrict government purchases to those at or above a particular supplier's costs. That regulation is by its terms a counsel of policy referable, not to state determination, but to the "sound judgment by all personnel concerned with the procurement." Cf. Paul v. United States, supra, 371 U.S. at 253, 83 S.Ct. at 432.

Even if we assume that the "cost" provision of the state's program would not in itself conflict with federal procurement, there is the further inherent difficulty that federal procurement officials would not be in a position to know whether an accepted bid could be performed by the bidder unless and until the state Director of Agriculture made a determination, as provided by Section 4135, that the "cost" provisions of the statute had been complied with by the distributor in the particular case.

This could be done, as the state concedes in its brief, only through inquiry to the state Director of Agriculture concerning the bidder's costs in the particular case, or by the Director's distribution to federal procurement officials of "at least general cost guide lines" or by federal procurement notification to all bidders that acceptance of a bid is "subject to possible state enforcement action under Agriculture Code Section 4135."

Realizing the practical conflict in this respect with orderly procurement, the State of California, without conceding its right to seek injunctive relief to enforce its below cost statute, makes the suggestion that, if it be enjoined at all, it be enjoined only from seeking injunc-

tive enforcement against distributors but left free to resort to the sanctions of civil penalties and license proceedings to deter distributors from violating Section 4135.

The state makes the further argument that the pending case is not controlled by Paul v. United States, supra, because the question there was simply whether there was a conflict between state enforcement of minimum wholesale prices and federal procurement policy while the pending case involves only the question whether state enforcement of producer prices conflicts with federal policy which itself provides for minimum producer prices in various federal marketing orders made under 7 U.S.C. § 608c(5).

The state cites Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) holding that a California marketing program for raisins should not be held to be an interference with interstate commerce when both state and federal statutes authorize similar types of marketing programs in order to stabilize the marketing of agricultural products.

However, as we have already noted, the state's program is not merely an enforcement of minimum producer prices. Further, it is conceded that federal marketing orders, although providing for payment of certain minimum prices by handlers to producers (7 CFR Part 1000 through Part 1199), do not purport to regulate the price at which a handler may sell its milk. We should add here that in Polar Ice Cream & Creamery Co. v. Andrews, supra, the Supreme Court, expressly declining to decide the question of state regulation of producer prices which the distributor must pay for milk to be sold to the United States, pointed out that "Florida does not purport to regulate the price which Polar [a milk distributor] must charge for milk sold to the Government on or off military bases. Florida regulates only the price which Polar must pay for its milk, not what it must sell it for." 375 U.S. at 379, 84 S.Ct. at 388.

As stated in Paul, "Policy-wise, it might be better if state price-fixing systems were honored by federal procure-ment officials. * * * Congress could of course write that requirement into the law." 371 U.S. at 255, 83 S.Ct. at 433.

However, even since these words were written, no such action has been taken by the Congress although bills for the purpose have been introduced. Thus, the policy of the Congress remains the same as it was at the time of Paul.

Since we are of the opinion that there is no reason for invoking the doctrine of abstention and that 28 U.S.C. § 2283 is inapplicable, we conclude that the motion for a preliminary injunction should be granted.

The government will prepare, serve and present, as provided by F.R.Civ.P. 52(a), formal findings of fact and conclusions of law in accordance with the views herein expressed.